United States District Court
Southern District of Texas
**ENTERED**
November 04, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAMES DANIEL GREEN, §
§
*Petitioner*, §
§
v. § Civil Action No. H-23-0577
§
BOBBY LUMPKIN, §
§
*Respondent.* §

## MEMORANDUM OPINION AND ORDER

Petitioner, a state prisoner proceeding *pro se*, filed a habeas petition under 28 U.S.C. § 2254 challenging his murder conviction and enhanced life sentence.  Respondent filed an answer as a motion to dismiss (Docket Entry No. 14), to which petitioner filed a response (Docket Entry No. 15).

Having considered the petition, the motion to dismiss, the response, the record, and the applicable law, the Court **GRANTS** the motion to dismiss and **DISMISSES** this lawsuit for the reasons shown below.

## I.  BACKGROUND AND CLAIMS

Petitioner was convicted of murder in Grimes County, Texas in April 2019 and was sentenced to life incarceration, enhanced by two prior felony convictions.  The conviction was affirmed on appeal.  *Green v. State*, No. 01-19-00399-CR, 2021 WL 2150765 (Tex. App.—Houston [1st Dist.] May 27, 2021, no pet.). Petitioner did not file a petition for discretionary review.  His application for state habeas relief (Docket Entry No. 13-21, pp.

32–53) was denied by the Texas Court of Criminal Appeals without a written order on

October 12, 2022.  (Docket Entry No. 13-8.)

Petitioner raises the following grounds for habeas relief in this petition:

1.  He was denied counsel during the interview process.

2.  The State "turned his wife into an agent of the State."

3.  His prior attorney gave his wife legal advice during petitioner's prior trial, causing a conflict of interest and unlawful conviction.

4.  Police sent a confidential informant with a tape recorder to his house.

5.  The prosecution erred in informing petitioner that, if he did not testify against the person who shot the victim, he would be tried and given a life sentence.

6.  The state habeas courts did not respond to his communications or send him a copy of the findings of facts and conclusions of law, and denied his petition without a written order.

7.  The indictment was never proved, and he is not guilty of murder.

Respondent argues that petitioner's claims are procedurally defaulted and barred in

part, are not cognizable, have no merit, and should be dismissed.

## II.  FACTUAL BACKGROUND

The intermediate state court of appeals set forth the following statement of facts in its

opinion affirming petitioner's conviction:

The decedent, Jason Currie ("Currie"), went missing on June 25, 2016.  A few days before his disappearance, Currie accidently pocket-dialed Colton Manning's ("Manning") cell phone.  Appellant James Daniel Green ("Green"), who was with Manning when Currie called, overheard Currie tell another man that he was planning to steal three ounces of methamphetamine from Green.

2

Unaware that Green had overheard the prior conversation, Currie called Green on June 25, 2016, to arrange a purported drug purchase. Currie and his friend, Mike Melson ("Melson"), met up with Green and Manning at Green's home that afternoon. After using methamphetamine, the four men drove to a friend's deer camp where Currie and Melson believed they would consummate the drug transaction. After arriving at the secluded location around dusk, Green angrily confronted Currie about the earlier phone call to Manning and other matters. Currie denied ever saying he would rob Green and claimed that a mutual friend had stolen his phone. According to Green, Manning and Currie then got into a physical altercation and Manning shot Currie several times with a .38 revolver. Green admitted that he also shot at Currie with a sawed-off .410 shotgun when Currie was lying on the ground. He does not know, however, if his shots hit Currie.

Green and Manning considered shooting Melson as well, because Melson had witnessed Currie's murder. Instead, they gave one of the guns to Melson and forced him to shoot Currie, which in their minds incriminated Melson for Currie's murder. When Green and Manning turned away to get more ammunition, Melson fled in Currie's truck. He wrecked the truck, however, and ran through the brush to a nearby home to seek help. The homeowner called 911 around 10 p.m. and reported that Melson was banging on the door begging to come inside because someone was following and intending to shoot him. Melson told the Grimes County Sheriff's deputy who responded to the call that Currie had been shot. The deputy thought Melson was high on narcotics and did not appear to take Melson's claim seriously.

After Melson fled the deer camp, Green and Manning loaded Currie into the back of Green's truck and looked for a place to dispose of the body. They eventually threw Currie's body into a ditch off a dirt road and returned to the deer camp to clean up and burn all evidence of the murder. Green and Manning then drove to Green's home where Green's alleged common-law wife, Mary Mariah Craig ("Craig"), had been waiting up for him. It was late in the evening and Craig was getting ready for bed when Green arrived. When she pressed Green for information about where he had been, Green allegedly told Craig that he and Manning had just killed Currie. When Craig found out Manning and Green were leaving again, she insisted on going along because she wanted to spend time with Green. The three of them then left in Green's minivan and drove towards Manning's grandparents' home in the country. According to Craig, Manning wanted to show the property to Green for reasons unknown to her. By this time, calls and information were coming into the sheriff's office from various sources implicating Green and Manning in

3

Currie's disappearance. According to Craig, Manning became nervous when he saw a police vehicle heading in the direction of Green's home and he opened the passenger-side door and threw a backpack out of the minivan.

After arriving at Manning's grandparents' home in the early morning hours, the trio drove around the property. One of the planks on a wooden trestle bridge they were trying to cross broke and the minivan became stuck on the bridge. Manning left Green and Craig behind with the minivan to get help. He called Mike Ferguson ("Ferguson") between 3 and 4 a.m. on June 26, 2016, and begged him to come and pull the van off the bridge. Ferguson and another man eventually arrived and freed the minivan. Manning, who had fallen asleep outside his grandparents' home, left in the minivan with Green. Craig, who left with Ferguson, returned home later that morning. Green left the county, but he eventually returned home that evening.

After Green returned home, Green and Craig retrieved Currie's body from the ditch, loaded it into the back of Green's truck, covered the body with various items, and then looked for a new place to dispose of the body. Green and Craig eventually left Currie's body in a creek bed on a ranch next to the Manning family property. They then burned additional items off the county road, near the ranch.

Captain Blake Jarvis ("Captain Jarvis"), Investigator Daniel Wagnon ("Investigator Wagnon"), and Investigator Kindale Pittman ("Investigator Pittman") of the Grimes County Sheriff's Office, as well as Ranger Jeff Owles with the Texas Rangers ("Ranger Owles") and other law enforcement officials continued to investigate Currie's disappearance. They recovered Currie's wrecked truck and the backpack Manning had thrown out of the minivan, but they were unable to locate Currie. The backpack contained, among other things, a sawed-off .410 shotgun, shotgun shells, a handgun holster, and various clothing items.

On July 6, 2016, Green, Craig, and Ferguson were arrested for theft of a tractor unrelated to Currie's murder. Captain Jarvis and Ranger Owles tried to interview Green when he was taken into custody on the theft charge. After advising Green of his rights under Article 38.22, Section 2(a) of the Texas Code of Criminal Procedure and *Miranda v. Arizona*, 384 U.S. 436 (1966), Green invoked his right to counsel and the officers ended the interview. Later that day, Captain Jarvis and Ranger Owles interviewed Green at Green's request. The officers advised Green of his rights prior to the second interview

4

and Green waived his rights.  He agreed to speak with the officers and did not invoke his right to counsel.

On July 11, 2016, Craig, who was still in custody on the theft charge, went on a ride with Investigators Pittman and Wagnon to try to locate Currie's body. Craig became very upset on the ride back to the jail and repeatedly asked the investigators to let her speak with Green.  A recording of Craig's conversation with the officers was admitted into evidence during the suppression hearing. Investigators Pittman and Wagnon conveyed her request to Captain Jarvis, and he agreed to facilitate a meeting between Craig and Green.

That same day, Craig and Green met in one of the interview rooms equipped with audio and video recording.  When asked why she wanted to talk to Green, Craig testified at the suppression hearing: "Because I wanted Danny to confess.  I wanted him to admit.  I wanted to be done with the whole situation. I wanted to be able to go home.  I just wanted to be – I wanted it to end." Craig also testified that Captain Jarvis, Investigator Wagnon, and Investigator Pittman did not promise her anything to get her to speak with Green or request that she ask any specific questions of Green.  She also denied having any agreement with them to elicit information from Green that they could use in their investigation.

Captain Jarvis testified that he did not ask Craig to ask Green any specific questions or give her instructions about the meeting.  He denied promising Craig anything to get her to speak to Green.  Captain Jarvis also stated that he did not promise Green or Craig they would have privacy in the interview room, and Green and Craig knew or should have known based on prior interviews that their conversations in that room could be recorded. Investigator Pittman testified that it was Craig's idea to meet with Green. Investigator Pittman also stated that neither he nor Investigator Wagnon asked Craig to talk to Green.  He also testified that he did not request Craig to ask Green any questions about Currie's murder or any other matter.  He also denied promising Craig anything to meet with Green or having any kind of agreement with Craig to act as an agent of the State to elicit information from Green for the investigation.

Investigators Pittman and Wagnon tried to interview Green right after his meeting with Craig.  Investigator Pittman, however, acknowledged at the suppression hearing that the officers did not advise Green of his rights before speaking with him on July 11, 2016.  The interview was included on the same recording as Green's and Craig's conversation, and the entire recording was admitted into evidence for purposes of the suppression hearing without

objection.  No evidence regarding Investigators Pittman's and Wagnon's July 11, 2016, interview with Green was admitted at trial.

On July 13, 2016, Captain Jarvis learned that someone was trying to post bond for Green and Captain Jarvis conveyed this information to Craig.  According to Craig, Captain Jarvis told her that if she helped them locate Currie's body, he would help get her released on a personal recognizance bond and she could go home to her kids.  Craig led investigators to Currie's remains later that day.  She also led them to the first location where Green and Manning had disposed of Currie's body.  Craig was released on a personal recognizance bond and set up with a motel room for a few days and money for clothes and food.  Green called Craig from jail multiple times after her release.  Four calls in which Green made inculpatory statements to Craig about Currie's murder were admitted into evidence.

Captain Jarvis tried to meet with Green again on July 14, 2016, after they found what they believed to be Currie's body, but Green invoked his right to counsel, and Captain Jarvis ended the interview.  On July 18, 2016, Captain Jarvis brought Green back to the interview room.  Captain Jarvis told Green that Craig had called him over the weekend to let him know that Green wanted to talk to him.  Green confirmed that he had requested to talk to Captain Jarvis.  Green told Captain Jarvis that he had spoken with Craig on the phone, and she had convinced him to ask for the meeting.  Captain Jarvis then read Green his rights under Article 38.22 and *Miranda*.  Green waived those rights, agreed to speak to Captain Jarvis, and did not invoke any of his rights.  He confessed to Currie's murder.  A recording of Green's confession and a transcript of the interview were admitted into evidence at trial.

*Green*, 2021 WL 2150765, at *1–3 (footnotes omitted).

### III.  LEGAL STANDARDS

This petition is governed by provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme

6

Court.  *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent.  *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

However, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102.  As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.*, at 102–103 (emphasis added; internal citations omitted).

AEDPA affords deference to a state court's resolution of factual issues.  Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding.  *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003).  A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the

presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31.  This presumption of correctness extends not only to express factual findings, but also to implicit findings which are necessary to the state court's conclusions of mixed law and fact.  *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018).

## IV.  ANALYSIS

### A.    Procedural Default and Bar

In his first and fifth habeas claims, petitioner contends that he was denied counsel during a police interview and that the prosecution gave him erroneous information.[1] Respondent argues that these claims are unexhausted, procedurally defaulted, and barred from consideration by this Court because petitioner did not raise them in a petition for discretionary review or on state collateral review.

Before seeking review in federal court, a habeas petitioner must first present his claims in state court and exhaust all available state court remedies through a proper adjudication on the merits.  *See* 28 U.S.C. § 2254(b)(1)(A) (federal habeas relief may not be granted unless it appears petitioner exhausted remedies available in the state courts). The exhaustion requirement is satisfied if the substance of the federal habeas claim was presented to the highest state court in a procedurally proper manner. *Baldwin v. Reese*, 541 U.S. 27,

---

[1]According to petitioner, "The prosecution or DA was mad at me because I wouldn't take a plea and then get on the stand to testify.  I didn't get a fair trial and all my rights was violated." (Docket Entry No. 1, p. 11.)  Although petitioner complains that "the shooter" was given a much lower sentence of twenty-five years, the record shows that petitioner's sentence was enhanced by two prior felony convictions, which allowed the jury to assess his sentence for life imprisonment.

29-32 (2004); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002). In Texas, this exhaustion requirement is generally satisfied if the substance of the claim was presented to the Texas Court of Criminal Appeals in a procedurally proper manner either through a petition for discretionary review or through a state application for writ of habeas corpus. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).

If a petitioner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, then a petitioner's claim is procedurally defaulted from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012); *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). A petitioner's state habeas claim is also subject to procedural default if "a state court clearly and expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal." *Nobles*, 127 F.3d at 420. The only way for a petitioner to overcome a procedural default is either to show cause for the default and resulting prejudice, or to demonstrate that the federal court's failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750-51 (1991); *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004). This latter exception "is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him." *McGowen v. Thaler*, 675 F.3d 482, 499 (5th Cir. 2012).

Petitioner did not raise these claims in a petition for discretionary review or on state collateral review. The claims are unexhausted and procedurally defaulted at this juncture. Petitioner pleads no viable grounds for, or factual allegations supporting, cause and prejudice as to his procedural default, nor does he demonstrate that a miscarriage of justice will result if the Court does not consider his defaulted habeas claims.

Petitioner's first and fifth federal habeas grounds are procedurally defaulted, and respondent is entitled to dismissal of the claims as procedurally barred.

B.    Craig as Agent of the State

In his second habeas claim, petitioner argues that the State "turned his wife [Craig] into an agent of the State." Petitioner sets forth no factual basis for this claim in his petition. To the extent petitioner's federal habeas claim is limited to his argument that the State "turned his wife into an agent of the State," no federal constitutional violation is shown and no cognizable federal habeas claim is raised.

Nevertheless, in the interest of justice, the Court will look to the claims petitioner raised on direct appeal and state collateral review in an effort to understand and liberally construe his second federal habeas claim to the extent reasonably possible.

On direct appeal, petitioner argued that statements he made to Craig were inadmissible because the State had "turned her into its agent" in having her obtain incriminating statements from him. In denying the claim, the intermediate state court of appeals held as follows:

10

In his first issue, Green argues that the trial court abused its discretion by denying his motion to suppress incriminating statements he made to law enforcement and Craig. According to Green, the statements were not made freely and voluntarily and thus their admission violated Articles 38.22 and 38.23 of the Texas Code of Criminal Procedure. Green contends that Craig was acting as an agent of the State and coerced him to confess. According to Green, Craig induced him to make incriminating statements to law enforcement while he was in custody.

\* \* \*

Green confessed to Currie's murder when he met with Captain Jarvis on July 18, 2016. The record reflects that [petitioner], who had requested the meeting with Captain Jarvis through Craig, waived his rights and agreed to speak with Captain Jarvis. Green argues on appeal that his statements to Captain Jarvis were not given freely and voluntarily because Craig coerced or induced him to confess and make incriminating statements to law enforcement. Green, however, does not explain how Craig allegedly coerced or induced him. Craig was not present during the July 18 interview, and she did not previously discuss the nature of the meeting or what would be discussed with Captain Jarvis. Green does not provide a factual basis for his assertions or identify any other reasons why his statements to Captain Jarvis were inadmissible.

Green also complains about the admission of incriminating statements uttered during certain phone calls with Craig. The record reflects that Green initiated each of those phone calls, not Craig, and that Green offered the incriminating statements voluntarily and not in response to questioning by Craig. Thus, Green's statements to Craig were not a product of custodial interrogation.

Based on the record, we conclude that the trial court did not abuse its discretion by denying Green's motion to suppress his statements to Craig and Captain Jarvis.

*Green*, 2021 WL 2150765, at \*4–5 (case citations, footnotes omitted).

However, petitioner cannot here challenge this ruling made by the intermediate state court of appeals, as he failed to exhaust the issue through a petition for discretionary review with the Texas Court of Criminal Appeals. The claim is unexhausted, procedurally

11

defaulted, and barred from consideration in this proceeding.  In an effort to excuse his default, petitioner argues that, "I didn't file a PDR because I was told I could get a lawyer – I filed for an extension and got it – sent to my county asked for attorney – never got no answer.  Had to file out of time PDR."  (Docket Entry No. 1, p. 11.)  Petitioner does not demonstrate good cause for his default, as he obtained an extension of time to file, was aware of the deadline, was not appointed counsel, and did not file a PDR.  Nor does he show that the Court's failure to consider these claims would result in a fundamental miscarriage of justice.  Petitioner's habeas claim must be dismissed to the extent it is predicated on the ruling of the intermediate court of appeals.

In his application for state habeas relief, petitioner again complained that the State "turned his wife into an agent of the State."  In support, he argued as follows:

GROUND ONE:  Under the Bill of Rights and through the 14th Amendment. I was denied due process of law.  My wife was used as agent of State.

In the interrogation room with the detectives at the Grimes County Jail [my wife, Mariah] at the time was turned as a [*sic*] agent of the State.  She was under force of coercion and manipulated by the detectives which is clearly seen by going over the transcript of the interviews.  [My wife] said at the hearing to suppress to the D.A. that she did not believe we was [*sic*] common law married and later on the stand at trial my attorney ask [*sic*] the same question and again she lied under oath and said "absolutely not."  There are 3 letters from [my wife] to me sent to the jail that she sent – "Mariah Green to James Green" and in the letters she says she is my wife and I'm her husband. Also, see jail phone calls that me and Mariah had with each other – and we called each other husband and wife.  Detective [*sic*] Jarvis was being evasive when asked by my attorney if he knew that Mariah and I looked at each other as husband and wife.  He said no at first and then after hearing [a defense audio exhibit] his memory was refreshed and he then said yes.  Detective Pittman said on the stand that he knew that Mariah and I was [*sic*] common law married.  I have much more and would like to talk in person.  I have

> evidence and witnesses that will come forward to testify to this. My
> constitutional rights was [*sic*] then violated after my 14th Amendment was set
> aside.  My 4th, 5th, 6th, 7th, 9th Amendment, Article 1 Clause 9, Article 1
> Clause 10 [*sic*], when the law was impairing the contract with me and my wife.
> 9th Amendment when the detectives was [*sic*] telling my wife all kinds of bad
> things while I was being held by the people.  It was all lies about me to her.
> My lawyer objected – the judge – duly noted.

(Docket Entry No. 13-21, pp. 37–38.)  The state trial court did not enter findings of fact and

conclusions of law, and the Texas Court of Criminal Appeals denied petitioner's application

for state habeas relief without a written order.  Thus, petitioner's claim was denied on the

merits.

In the instant federal habeas proceeding, petitioner states in relevant part as follows:

> GROUND ONE:  Due Process, Bill of Rights, Constitution [*sic*] Rights.
> Turned my wife – common law – as agent of State.

(Docket Entry No. 1, p. 6.)  As no further facts or argument are presented, the Court will look

to the arguments raised by petitioner in his application for state habeas relief.

The fact that petitioner's alleged common law wife testified at trial that they were

"absolutely not" "common law married" does not give rise to a cognizable federal habeas

claim.  Nor does it raise a cognizable federal habeas claim that defense counsel impeached

Captain Jarvis as to his knowledge that petitioner and Craig held themselves out as husband

and wife.  Moreover, petitioner's conclusory allegation that the State "turned my wife into

an agent of the State" is both unsupported in the record and fails to raise a cognizable federal

habeas claim.

13

The state court denied habeas relief.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, federal law or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to dismissal of this claim.

C.    Conflict of Interest

Petitioner next argues in his third claim that his prior attorney gave his wife legal advice during petitioner's other trial, causing a conflict of interest.  In support, he complains that his wife's counsel represented her during petitioner's murder trial even though her counsel had once represented petitioner in a separate criminal case that the State was using to enhance petitioner's punishment range in the murder case.  Petitioner argues that this gave rise to a conflict of interest, resulting in an invalid conviction.

Petitioner argued on direct appeal that the state trial court erred in "allowing [his wife's] counsel to represent her during [petitioner's] murder trial even though her counsel had once represented [petitioner] in a separate criminal case that the State was using to enhance [his] punishment range in this case." *Green*, 2021 WL 2150765, at *1.  In denying petitioner's issue on appeal, the intermediate state court of appeals held as follows:

> In his fifth issue, Green argues that the trial court abused its discretion by allowing Craig's appointed counsel, [M.M.], to represent her at Green's trial even though [M.M.] had once represented Green in a criminal matter that the State was trying to use to enhance the applicable punishment range for Green. The record reveals that [M.M.] represented Green in a case involving two counts of burglary of a habitation in 2005. Green, who was sentenced to two

14

terms of forty years' imprisonment to run concurrently for the 2005 burglary, was on parole for the offenses when Currie was murdered.

The State argues that Green waived this argument because he did not file a motion to disqualify [M.M.] and that even if he had filed such a motion and the trial court had denied it, he should have challenged the decision by filing a petition for writ of mandamus. Even if we assume, without deciding, that Green properly preserved the issue for appeal, Green still would not prevail.

A party moving for disqualification based on violation of a disciplinary rule must "establish with specificity" that the disciplinary rule was violated. We review a trial court's refusal to disqualify a lawyer for abuse of discretion.

Green alleges that [M.M.] should have been disqualified because his representation of Craig violated Texas Disciplinary Rule of Professional Conduct 1.09. Rule 1.09 section (a) states:

> (a)    Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:
>
> > (1)    in which such other person questions the validity of the lawyer's services or work product for the former client;
> >
> > (2)    if the representation in reasonable probability will involve a violation of Rule 1.05; or
> >
> > (3)    if it is the same or a substantially related matter.

TEX. DISCIPLINARY RULES OF PROF'L CONDUCT 1.09(a). Rule 1.09 does not absolutely prohibit a lawyer from representing a client against a former client. *See* TEX. DISCIPLINARY RULES OF PROF'L CONDUCT 1.09 cmt. 3.

The question under section(a)(2) of Rule 1.09 is whether Green established that [M.M.'s] representation of Craig during Green's murder trial "in reasonable probability [would] involve a violation of Rule 1.05." Rule 1.05 protects confidences. Before a trial court may disqualify a lawyer under Rule 1.09(a)(2), the court must find a reasonable probability that some aspect of 1.05 will be violated. Rule 1.05, referenced in Rule 1.09(a)(2), addresses a lawyer's duties with respect to a client's confidential information. Rule 1.05(b), pertinent to this action, provides:

15

(b)   [A] lawyer shall not knowingly:

(1)   Reveal confidential information of a client or a former client[.]

\*   \*   \*

(3)   Use confidential information of a former client to the disadvantage of the former client after the representation is concluded unless the former client consents after consultation or the confidential information has become generally known.

*Id*. 1.05(b)(1) & (3).  "Confidential information" is defined as

"Privileged information" refers to the information of a client protected by the lawyer-client privilege of Rule 503 of the Texas Rules of Evidence or of Rule 503 of the Texas Rules of Criminal Evidence[.] "Unprivileged client information" means all information relating to a client or furnished by the client, other than privileged information, acquired by the lawyer during the course of or by reason of the representation of the client.

*Id*. 1.05(a).

Because [M.M.] represented Green in the 2005 burglary cases, section(a)(3) of Rule 1.09 only prohibits [M.M.] from representing Craig in this case "if it is the same or a substantially related matter."  *Id*. 1.09(a)(3).

At trial, Green's counsel objected to Craig testifying, arguing: "I believe there's a direct conflict of interest between [M.M.'s] representation of Craig and his former representation of my client. And I would like that reflected in the record."  Green's counsel explained that the conflict had arisen when Craig, who had referred to Green as her husband during the initial investigation, testified at the hearing on the motion to suppress that she did not consider herself married to Green and was not invoking spousal privilege. According to Green's counsel, "the conflict arises, Judge, where the testimony is adverse to my client and there's been legal advice given to Craig as to a particular legal issue, specifically the issue of marriage and common-law

16

marriage by [M.M.] to Craig. And that legal advice is contrary to what's in the best representation of his former client Green."

Although Green identified the general subject matter at issue (the existence of a purported marriage between Green and Craig), he failed to demonstrate that the factual matters involved in his 2005 burglary case were so related to the facts in the present murder case that [M.M.'s] representation of Craig created a genuine threat that confidences Green revealed to [M.M.] during his representation of Green in 2005 would be divulged to Craig in 2016. Green also did not offer any evidence that there is a "reasonable probability" that [M.M.] could reveal confidential information Green shared with him during the 2005 case.

We conclude that the trial court did not act in an unreasonable or arbitrary manner when it allowed [M.M.] to represent Craig, and therefore, the trial court did not abuse its discretion.

*Green*, 2021 WL 2150765, at *7–9 (citations omitted).

However, petitioner cannot here challenge this ruling made by the intermediate state court of appeals, as he failed to exhaust the issue through a petition for discretionary review with the Texas Court of Criminal Appeals. As with his earlier claim, *supra*, this claim is unexhausted, procedurally defaulted, and barred from consideration in this proceeding. Petitioner does not demonstrate good cause for his default, nor does he show that the Court's failure to consider these claims would result in a miscarriage of justice. Respondent is entitled to dismissal of this claim as procedurally defaulted and barred from review.

In the alternative, the state court denied habeas relief. In so doing, the state court found this claim to lack merit. In disagreeing with the state court's denial of habeas relief, petitioner does not meet his burden of proof under AEDPA. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of,

federal law or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to dismissal of this claim.

D.    Confidential Informant

In his fourth habeas claim, petitioner complains that the police equipped a friend of his, Mike Ferguson, with a tape recorder and told him to go to petitioner's house and record information as a "confidential informant."  Petitioner argues that this was unlawful and denied him due process because Ferguson was on probation and could not legally act as a confidential informant.  Petitioner further argues that the police promised Ferguson that his probation violation would "go away" if Ferguson agreed to obtain the tape recording, which violated petitioner's due process rights.

Petitioner provides no authority supporting his argument that this was an unconstitutional action for purposes of federal habeas relief, nor did he raise this issue on direct appeal.  Further, the state court trial record shows that Ferguson did not go through with the alleged ruse, and did not obtain any recorded information from petitioner.  6 R.R. 39–40.  To the contrary, Ferguson told petitioner of the attempted tape recording and of his refusal to participate.  *Id*.  Nothing obtained by Ferguson via tape recording was introduced against petitioner at trial.

The state court on collateral review denied habeas relief, thus denying relief on this claim.  Petitioner's conclusory argument that police "coerced and forced" Ferguson into going to petitioner's house does not meet his AEDPA burden of proof.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable

application of, federal law or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to dismissal of this claim.

E.    Infirmities in State Habeas Proceedings

In his sixth habeas claim, petitioner complains that the state habeas courts failed to communicate with him because only the clerk of court, not the judge, sent him information; that he did not receive a copy of the findings of fact and conclusions of law[2]; and that his petition was denied without a written order.[3]

As correctly argued by respondent, purported infirmities of this nature in the state habeas proceedings do not give rise to cognizable claims for federal habeas relief, as "infirmities in state habeas proceedings do not constitute grounds for relief in federal court." *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997); *see also Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself.") (internal quotation marks omitted).

Petitioner's sixth habeas claim warrants no relief, and respondent is entitled to dismissal of the claim.

---

[2]The state trial court did not enter findings of fact and conclusions of law.  (Docket Entry No. 13-21, p. 2.)

[3]"If you check you will see the motions I sent to the Court of Criminal Appeals – never got a response from the Judge only the Clerk."  (Docket Entry No. 1, p. 11.)  "I was sent to the hospital and I did not get my answer from the court until 2/2/23.  This can be shown by the mail room here because it was put on file."  *Id.*  Even assuming these infirmities were to constitute cognizable federal habeas claims, they did not give rise to violations of petitioner's constitutional rights.

F.      Insufficiency of the Evidence

In his federal habeas form under "Relief sought in this petition," petitioner states, "I ask that you read over my trial – you will see that the indictment was never proved.  I'm not guilty of murder.  I ask that this be overturned."  (Docket Entry No. 1, ¶ 21.)  Although not presented as a separate habeas claim, the Court liberally construes petitioner's allegations as a challenge to the sufficiency of the evidence.  However, no habeas relief is warranted under this seventh and final habeas claim.

Texas courts have consistently held that claims of sufficiency of the evidence must be raised on direct appeal and are not cognizable in post-conviction writs of habeas corpus.  *See Ex parte McLain*, 869 S.W.2d 349, 350 (Tex. Crim. App. 1994) (holding evidentiary sufficiency claims are not cognizable in post-conviction collateral attacks); *West v. Johnson*, 92 F.3d 1385, 1389 n.18 (5th Cir. 1996) (recognizing this legal principle under Texas law).  Specifically, the Texas Court of Criminal Appeals has held that, "where an applicant challenges the sufficiency of the evidence on an application for a writ of habeas corpus, and we subsequently dispose of the application by entering a denial without written order, the applicant's sufficiency claim was denied because the claim is not cognizable."  *Ex parte Grigsby*, 137 S.W.3d 673, 674 (Tex. Crim. App. 2004).  Thus, for purposes of petitioner's sufficiency challenge in this federal proceeding, the state courts denied the claim as failing to raise a cognizable state habeas claim.

Moreover, petitioner did not challenge the sufficiency of the evidence on direct appeal, and his claim is unexhausted and procedurally defaulted.  He demonstrates no cause

and prejudice for the default, nor does he establish that a miscarriage of justice will result should the Court not consider his claim.

In the interest of justice, the Court has reviewed the trial record in petitioner's criminal conviction and finds sufficient evidence to support the conviction for murder under the standards imposed by *Jackson v. Virginia*, 443 U.S. 307 (1979). Review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993); *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004). All credibility choices and conflicting inferences must be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005). A federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact finder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995). Consequently, petitioner's disagreements with the evidence and his conclusory assertions that the witnesses were not truthful do not establish insufficiency of the evidence, and federal habeas relief is unwarranted.

Petitioner's habeas challenge to the sufficiency of the evidence to support his conviction is dismissed as procedurally defaulted. In the alternative, the claim is dismissed as unsupported in the record.

## V.  CONCLUSION

For the above reasons, the motion to dismiss (Docket Entry No. 14) is **GRANTED** and this lawsuit is **DISMISSED WITH PREJUDICE**.  Any and all pending motions are **DISMISSED AS MOOT**.  A certificate of appealability is **DENIED**.

Signed at Houston, Texas, on this the  4th  day of November, 2024.


KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE